Edwards, J.
In order to decide upon the rights of the respective parties, to this suit in reference to the fund in controversy, it will be necessary, first, to ascertain what was the character of the arrangement between Gower & Co., and the defendants, and the plaintiff Dodge, as to the shipments of cotton to be made by him; and I do not consider it necessary for that purpose.to refer to any of the correspondence of an earlier date than the létter of the 14th August, 1846. That letter contains the basis of the arrangement between Dodge and Gower &’Co., and whether taken by itself, or in connection with the subsequent correspondence, it seems to me that it clearly shows that the understanding of the parties was that Dodge should act under the authority and pur *583 suant to the directions of Gower & Co. They say that they are willing to receive consignments through his instrumentality ; that they authorize him to make advances on their account; that such advances may be made either by his drawing upon them, or upon some persons in New-York who shall value upon them; and they refer him to the defendants, who, they say, will be advised of the arrangement, and be requested to co-operate in carrying it into execution. On the 18th August, 1846, Gower & Co. wrote a letter to the defendants informing them of the arrangement which had been made with Dodge, and requesting them to give their assistance in carrying it out. The particular manner in which the defendants were to render their aid is not stated in this letter, but it is alleged in the bill of complaint, and admitted in the answer, that the course of business was for Dodge to consign the cotton shipped by him under his agency arrangement to Gower & Co., and to forward the bill of lading, and invoice of shipment, made out in the name of Gower & Co. to the defendants, and to draw upon them for the amount of the advance which they, acting under the arrangement, were to make upon the same, and that' they, upon satisfying themselves that such drafts were in accordance with the instructions of Gower & Co., were to accept and pay the drafts, and were to reimburse themselves by drawing upon the latter firm for the amount thereof, and their commission. This arrangement, which is clearly proved, or admitted, shows what were the relations between the different parties.
In the month of April, 1847, the plaintiffs made * three shipments of cotton to Gower & Co., and transmitted to the defendants the invoices and bills of lading made out to the consignees, and drew upon the defendants as usual. These drafts were accepted and paid. The defendants then drew upon Gower & Co., in London, to reimburse themselves. Two of the bills thus drawn were accepted and paid, and the rest were accepted but not paid; Gower & Co. having *584 become bankrupt. At the time of their failure there was a portion of the cotton shipped to them remaining unsold. This was afterwards sold, and an account was made up between all the parties, by which it appeared that after debiting the whole of the bills drawn upon and accepted by Gower & Co., as if they had all been paid there remained a surplus of ¿£1,285 3s, lid, which forms the subject of controversy in this suit. It is clear that the defendants have no claim against this surplus as consignees who have made advances, for the cotton was never either actually or constructively consigned to them. On the contrary it was shipped directly to Gower & Co., and the bills of lading and invoices were made out to them. It is true that they were transmitted to the defendants in the first place, but this was merely for the purpose of enabling them to comply with the instructions of the consignees as to the amount of advances which they should make.
It is contended, however, that although the defendants may have no lien on the shipments as consignees, still that they have an equitable right to them, on the ground that, by the nature of the arrangement existing between the parties, they were appropriated to pay all the bills of. the defendants which were accepted by Gower & Co. It is not pretended that there was any express agreement to that effect, and it seems to me that no such agreement can be implied from the nature of the arrangement, or from the correspondence between the parties. The defendants never intimated, either to Dodge or to Gower & Co., that they relied upon or looked to the proceeds of^the shipments as the fund out of which they expected that their bills would be paid; and none of the parties ever intimated to the defendants that such proceeds should be appropriated for that purpose. The bills of lading and invoices were transmitted to the defendants, not for the purpose of showing them that there would be a fund sufficient to meet the drafts which they .should draw to reimburse themselves for advances made *585 to Dodge, but to enable them to see that Dodge did not draw beyond the amount which Gower & Co. had by their arrangement with him agreed to advance. In the letter of the defendants of the 8th October, 1846, to Gower & Co., they say that their charge of a commission of one per cent is justified by their care and anxiety in seeing that the drafts drawn upon them are in conformity with the letters 'of instructions given by Gower & Co. to their agents in this country ; and the defendants suggest that they may make a different arrangement as to commissions, if Gower & Co. will authorize them to accept and pay all drafts drawn by their agents, and value upon Gower & Co. free from any other responsibility. The only testimony which is offered to show that the defendants, in drawing upon their London correspondents, relied upon the shipments of cotton made by the plaintiffs, is, that the bills of exchange drawn upon Gower & Co. have a direction to charge the amount thereof to account of Dodge. But it appears from the letter last all uded to that Gower & Co. had other agents in this country besides Dodge, to whom they were in the habit of making advances through the defendants; and it was necessary, for the purpose of keeping these accounts distinct from each other, that Gower & Co. should know to which account the bills drawn upon them by the defendants should be charged. The case of Thomas v. Da Costa (8 Taunt., 345), which was relied upon by the defendants, shows that there may be an appropriation of the proceeds of consignments for the payment of bills drawn upon a person other than the consignee, where there is an express agreement to that effect; but neither that, nor any other case cited by the defendants, shows that either a court of law or of equity will make such an appropriation where there is no such agreement, express or implied, as is the case here.
Suppose, however, that we should come to the conclusion that, by the arrangement between the parties, there was an appropriation of the proceeds of the shipments to pay the *586 bills drawn by the defendants, does it follow that the defendants would be entitled to the fend in question? I think not. It will be remarked that this fund is the surplus which remains after debiting the whole of the bills drawn by the defendants, whether paid or unpaid. If Gower & Co., instead of applying the proceeds of the shipments to the payment of the bills of the defendants, have misappropriated such proceeds, surely the plaintiffs ought not to be made the sufferers. They never became insurers, either for the integrity or business punctuality of the consignees in their dealings with the defendants; and there is no principle of law, equity or justice upon which consignments of the plaintiffs can be made subject to a lien or claim beyond the advances which have been made to them. As to the fund in controversy, no advances have ever been made either by the consignees or the defendants; and, as it is admitted that the plaintiffs were the consignors, they are entitled to it.
Judgment should be affirmed, with costs.
Gardiner, Ch. J.
The only question presented is, as to the relation sustained by the plaintiffs, or rathei» Dodge, one of the plaintiffs, to the defendants, in the business, of which the making of the drafts stated in the pleadings, constituted a part. This fact has assumed an importance since the failure of Gower, Nephews & Co., which no one, before that event ever thought of attaching to it. It may be true, as the defendants insist, that they supposed that Dodge was ultimately responsible to them, for the payment of the money advanced on the drafts in question. But as the London house was primarily liable, and its credit undoubted, and as advances had been authorized by them, upon the actual consignment of- property, supposed to furnish a full indemnity, a failure to meet its engagements, was not probably among the contingencies entering into the calculation' of either of the parties. That house, however, did«fail on the 11th of September, 1847, leaving a part of the bills drawn *587 by the defendants, by way of reimbursing themselves, for advances made upon the lot of eight hundred bales of cotton, unpaid ; and the question arises, in what capacity were advances upon this parcel made by the defendants; which involves the others above suggested, in what relation did Dodge stand to the defendants, when the original drafts made byhim, were accepted and paid by the former. Was he the principal and was the acceptance of the defendants for his accommodation, or were both drawer and acceptor, the agents of a common principal, the firm of Gower, Nephews & Co., in London. The latter hypothesis is the only one consistent with the facts proved or admitted. That Dodge was the agent of the Gowers with authority to bind his principals, for an advance within prescribed limits for all cotton purchased at the south, or which he could influence to be consigned to them, according to the stipulations in the agreement of the 14th of August, 1846, while the defendants were also the agents of the same principals, acting under their instructions, in accepting all drafts drawn by Dodge upon them, on account of such advances, with the right to reimburse themselves by drafts on the consignees, which the latter were bound by their agreement to accept, and pay at maturity. .
This is obvious from the correspondence. Thus the letter from Gower, Nephews & Co., to Dodge, of the date above mentioned, and upon which the defendants’ counsel placed great reliance, declares, “ that these advances are in the usual manner to be made either by draft directly, on us, at from sixty to ninety days’ sight, or by your drawing on New-York at as long a usance as is practicable, the acceptors and payers there of these drafts reimbursing themselves at maturity, by valuing on us in time for the sterling equivalent, at the customary sight, and specifying in these drafts the payments against which they are issued.” They then add, “ that your own friends in New-York, Messrs. Markoe, Wilbur & Scott, will be advised of this arrangement and requested to co-op- *588 crate in carrying it into execution.” Accordingly, on the eighteenth of the same month, they enclose a copy of the arrangement with Mr. Dodge to those gentlemen, and in their letter remark, “ we have, in forwarding it to you, to confirm its contents as far as they apply to you, and beg that you will give your best assistance in carrying the plans traced out, into execution.” On the 11th December, 1846, the defendants wrote Dodge, as follows: “We refer to the various letters you have received from our friends, Messrs. Gower, Nephews & Co., in relation to advances on consignments to their address, the present season. We confirm their views and instructions as far as we have to do with them, and authorize your drafts upon us as usual to the extent of the authority granted yoü by them.”
If the evidence stopped here, which is by no means the case, I do not preceive that there could be any doubt as to the character in which the New-York house accepted and paid the drafts in question. They were drawn in pursuance of the authority conferred on Dodge by the agreement of the fourteenth of August, according to which Gower, Nephews & Co. were to make all the advances on cotton consigned to them, by means of bills drawn upon them directly, or circuitously on the defendants in the city of New-York. A copy of this agreement was placed in the hands of the defendants, with a request that -they would co-operate in its execution. To this they assented, not only by acting under it, as the evidence will prove, but by expressly ratifying it in a communication to the drawer.
They accepted these drafts, because they were authorized by the London house, and because they were requested by them to make'advances in this way, not for the accommodation of Dodge, but to enable the consignees to comply with their engagement. The consideration of their acceptance and payment was the agreement of Gower, Nephews & Co. to reimburse them, and a commission of one per cent, for supervising the business, so far as to keep the agents within *589 the authorized limits, and for advising their principals, from time to time, of the extent, and particular character of the responsibility incurred by them, in their behalf. When the securities were paid by the defendants, therefore, they discharged, pro tanto, an obligation of their principals to another agent, to advance upon consignments of property to them. The consignees became liable immediately to the defendants for the money thus advanced and their commission, and failing to accept and pay the bills drawn by way of reimbursement, they could have been sued as for money paid, and services rendered on their account and at their special request. Of this assumpsit the agreement and letters to which reference has been made, would furnish undoubted evidence.
No action could be maintained against Dodge upon the bills, as the defendants were the acceptors. Nor for money paid, because the defendants, knowing the precise relation in which he stood to the Glowers, that he drew by their instruction, with a view to raise money for their benefit, had recognized his agency and authorized his drafts upon them, “ to the extent ” of the authority granted. It is true that consigned property was made to pay ultimately all expenses, commissions of the defendants inclusive.
But the consignees were primarily liable for them and would be obliged to pay them, whether they succeeded in reimbursing themselves from the property or not. The defendants had no interest in or lien upon the cotton during . its transit, or on its arrival at its place of destination. The bills of lading were made to the consignees, who were to insure it and make disposition of it on account of the shippers. The communications and instructions of Dodge to the defendants, and through them to the house in London, are all reconcilable with the view above suggested. He was not only the agent of the Glowers in procuring consignments, but he sometimes acted as the agent of the shippers and was occasionally interested as owner of the property. In the latter capacity he was interested in the rate of exchange, *590 the time which the bills drawn against it had to run, commission, expenses and indeed every circumstance that might affect the price in the foreign market, and prevent or lessen the probability that it might afford a remuneration to the consignors. The correspondence of Mr. Dodge, to which reference has been principally made by the counsel of the defendants upon the argument,' is upon these topics, and as his relations to their common principal, to the shippers and to themselves, were perfectly understood by the defendants, there can be no pretence that they were misled to their prejudice.
They assume no such ground. But insist that they were entitled to the ultimate responsibility of Dodge, in addition to that of the English house, as to all moneys advanced on his drafts. I think there is nothing in the form in which the business was ■ uniformly transacted, or in the substantial relations of the parties to. each other, legally to justify this claim and that it was properly disallowed by the superior court.
There is no force in the suggestion, that a co-partnership was created between Gower, Nephews & Co., and Dodge by the contract of the fourteenth of August.
The latter was not to receive any part of the profits of the business of the English house arising from this or any other part of it. • He was to. receive one-third of the commissions as a compensation for his services. That this will not constitute a copartnership contrary to the expectation's of the parties has been too frequently held to be now an open question. (Burclclev. Eclchart, 3 Comst., 132.)
The judgment of the superior court should be affirmed.
All the judges concurring,
Judgment affirmed.